UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER MAVROMMATIS,
    Plaintiff,

v.

CAREY LIMOUSINE WESTCHESTER,
INC., ET AL.,
    Defendants.

No. 3:08cv1344 (SRU)

## RULING ON MOTION FOR SUMMARY JUDGMENT AND ORDER

Peter Mavrommatis brings suit against Carey Limousine Westchester, Inc., Carey Limousine Stamford, Inc., and Carey International, Inc. (collectively "Carey") alleging violations of the Age Discrimination in Employment Act ("ADEA"), Title VII, and 42 U.S.C. § 1981, as well as violations of state law including breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation. Carey moved for summary judgment (**doc. # 46**). Mavrommatis has moved to strike (**doc. # 79**) evidence submitted by Carey through affidavit. For the reasons that follow, the motion for summary judgment is **GRANTED** and the motion to strike is **DENIED AS MOOT**.

### I.    Background[1]

Mavrommatis, who was 46 at the beginning of the events in question, is a resident of New York. He was born in Cyprus. He speaks with an accent that people have described as "heavy" or "thick," although he has virtually no problem communicating and being understood.

---

[1] The facts are drawn primarily from admissions and assertions in Mavrommatis's Local Rule 56(a)(2) statement and the Affidavit of Peter Mavrommatis in Support of his Opposition to Defendants' Motion for Summary Judgment dated February 4, 2009 (Pl. Ex. C, Mavrommatis Aff.). In a few instances, I have incorporated undisputed evidence from Carey's Local Rule 56(a)(2) statement.

Carey is a chauffeured limousine service, with subsidiaries located throughout the United States and abroad.[2] In or about March 2000, Carey purchased County Limousine Services ("County").

Mavrommatis started in 1985 as a driver for County in Westchester, New York; he served as General Manager ("GM") from 1988 to 2000. Mavrommatis was earning $155,000 per year when Carey purchased County. In connection with the sale, Mavrommatis received approximately $1 million. Mavrommatis entered a 3-year contract to serve as the General Manager of the Carey Westchester operation for $100,000 per year; Carey had an option to renew the contract for an additional two years. Between 2000 and 2004, the headcount of Carey Westchester employees went down because the company switched from an employee-driver model to an independent contractor model.

Around August 2004, in a meeting with Doug Werdebaugh, Carey informed Mavrommatis that it was "merging Westchester with Stamford, and we have a general manager there." (Pl. Ex. B, Dep. of Peter Mavrommatis, Apr. 29, 2009 ("PM Tr."), 52:4-6.) John Martinez, an American-born citizen in his early 30s, had been newly appointed as Carey Stamford's General Manager. Mavrommatis had another six months to be GM of Westchester under his contract. Also in that meeting, Werdebaugh told Mavrommatis "I will consider you for other future opportunities within the Carey System." (PM Tr. 54:17-19.) In December 2004, Carey completed that merger and merged "much" of Westchester with the Stamford operations. Around March 2005, when Mavrommatis's five-year contract had run, Mavrommatis was made

---

[2] Each of the Carey business are Delaware corporations, with principal places of business in Stamford and Hartford, Connecticut, and in Washington, D.C. Mavrommatis argues that the defendants should be viewed as a single entity, and Carey has, for the purposes of the present motion, agreed to treat all three as Mavrommatis's "employer."

Operations Manager or Director of Operations of Carey Westchester with a salary of $80,000.[3]
Mavrommatis was not happy with the reduction in his pay.

Also around March 2005, Martinez resigned. Doug Werdebaugh, Senior Vice President of U.S. Operations, was responsible for hiring a new GM for Carey Stamford. In August 2005, Carey hired Lou Uritz, an American-born man in his 30's, as GM of Carey Stamford. GM positions were not generally posted; hiring and firing decisions were made by Werdebaugh.

In February 2006, Mavrommatis filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Carey discriminated against him based on age and national origin by, among other things, failing to choose him as Carey Stamford's GM. In late June 2006, Mavrommatis and Carey settled the charge. The parties agree that following the settlement, Mavrommatis was referred to as Director of Operations. As part of the settlement, Mavrommatis released any and all claims he had or may have had against Carey, contingent on defendants' compliance with the agreement.[4]

Sometime during or after June 2006, Uritz assigned Mavrommatis to an office in Stamford. According to Mavrommatis, the office was "outside the main area and security door for the executive officers, was located squarely between the men's and ladies' rooms . . . had no

---

[3] Carey asserts that Mavrommatis's new position was as Operations Manager, whereas Mavrommatis alleges he was made Director of Operations. The Director of Operations "is a very critical role . . . . [i]t is the de facto general manager if the GM isn't there." (Pl. Ex. D, Dep. of Douglas Werdebaugh, Aug. 6, 2009 ("Werd. Tr."), 17:14-15.)

[4] Mavrommatis described two incidents in his deposition that he argues support his claim that Werdebaugh discriminated against older workers and workers with accents. (PM Tr. 310, 327-31; *see also* Mavrommatis Aff. ¶ 18.) The incidents do not relate directly to Mavrommatis and the record shows they pre-date his settlement agreement. They provide no support for his present discrimination claim.

window, no door lock, no phones or telephone jack, a broken desk, tires and debris stacked in it, and it had never been used as an office before nor has it since." (Pl. 56(a)2 Stmt., doc. # 60, Pl. Material Facts ¶ 42.) Mavrommatis alleges that he complained immediately to Uritz about the office but that Uritz took no action. He additionally alleges that others lesser in rank than Mavrommatis had nicer working offices. Throughout the period in which Mavrommatis only had use of his cell phone in Stamford, Uritz told Mavrommatis that he could and should use the phone in Barcellos's office or Uritz's office.

In September 2006, Mavrommatis formally began to work three days per week in Stamford and two days per week in Westchester. On September 16, 2006, Mavrommatis sent an e-mail to Carey's senior management stating that the office Uritz had given him in Stamford constituted "harassment;" that he considered it to be a "dungeon;" and that he could hear distracting sounds from the adjoining bathrooms. He did not use the words "retaliation" or "discrimination" in his written complaint. Werdebaugh did not consider the e-mail to be a "formal complaint" and Carey made no investigation into it. Werdebaugh forwarded the complaint to Uritz. Uritz called Mavrommatis to say that Uritz was not happy that Mavrommatis had sent the complaining e-mail to Werdebaugh. As a result of the written e-mail complaint, Uritz gave Mavrommatis a large office Stamford, which he occupied for the next fourteen months (September 2006 - November 2007).

Carey claims that "[a]fter Mavrommatis assumed the [Director of Operations] position, Uritz found Mavrommatis to be routinely disrespectful and uncooperative in their interactions." (Def. Local R. 56(a)1 Stmt., doc. # 52, ¶ 58.) Mavrommatis, however, points out that Uritz gave Mavrommatis a favorable review in October 2006 that did not mention that purported deficiency.

In the review, Mavrommatis consistently achieved a "3" out of "5" score for each category of evaluation – a score that indicated he "[r]egularly and consistently fulfills the expectations of the job's responsibilities." (Pl. Ex. 5, Employee Performance Evaluation, at 2.) Uritz's evaluation includes the following comments: "[Peter] has done a good job in [maintaining] employee records and coaching the employees on a daily basis"; "His decisions are always consistent with Carey's policies and values"; "Peter did a good job over the past year in the daily management of the Westchester employees including our two house chauffeurs"; "Peter has a pleasant demeanor and he is always cordial with the employees"; "It is important that Peter knows that his manager has the utmost confidence in his abilities and appreciates his eagerness to make improvements." (*Id.* at 2-4.) In early December 2006, however, Uritz placed a document in Mavrommatis's personnel file indicating that Mavrommatis had performance problems; he continued to create Memos to Record through 2007. In January 2007, Mavrommatis began working full-time in Stamford after Carey permanently closed the Westchester office.

In early 2007, a General Manager position opened in Philadelphia. A younger New York employee, Carl Schmitt, was given the job; Mavrommatis was not considered for it. During the time period, Paul Barcellos, a young American-born employee, received a promotion from Dispatch Manager of Stamford to Director of Operations in Miami. Carey claims that it would not have considered Mavrommatis for positions outside of New York because it was Werdebaugh's understanding that he did not want to leave the New York area; Mavrommatis denies Carey's statements of his feelings and states that Werdebaugh had promised to consider Mavrommatis for GM positions when they became available elsewhere.

Mavrommatis timely filed administrative charges of continuing discrimination and

retaliation with the EEOC on December 12, 2006 and February 13, 2007. Carey was aware of the charges by February or March 2007 at the latest. Carey alleges that Werdebaugh was told that the EEOC investigator who spoke to Mavrommatis stated that Mavrommatis had expressed a desire to leave Carey but was concerned about the non-compete clause he signed as part of the settlement.[5] Mavrommatis claims that, during the lunch, Werdebaugh questioned Mavrommatis about the EEOC filing, asked if he wanted to leave Carey, tried to entice him to leave by offering a shortened non-compete period of six months rather than one year. Uritz stated that the lunch was scheduled because of Mavrommatis's filing of his second EEOC complaint. Mavrommatis complained about the meeting and his feeling that he had been ambushed in an e-mail to Carey senior management, but no action was taken.

On July 19, 2007, Carey provided Mavrommatis with a Performance Improvement Plan ("PIP") that set forth Mavrommatis's performance issues and gave him 90 days to improve or face termination. (Def. Ex. 17, Performance Improvement Plan Memorandum.) In the PIP, Uritz wrote: "You have complained that the Dispatch Manager position has not been filled since Paul Barcellos was transferred to Florida, but a small operation the size of Stamford/Hartford/Westchester does not require an Operations Manager and a Dispatch Manager." (*Id.* at 2.) Uritz also wrote:

> As a leader of [Dispatching], you need to provide hands-on support and encouragement to the employees. Instead, I find the employees coming directly to me for support because they feel you are not as involved as you should be with that operation. At least on one occasion you specifically told

---

[5] Mavrommatis claims the statements by the EEOC investigator are inadmissible hearsay and may not be considered. To the extent they are offered to show Werdebaugh's state of mind, however, they are not admitted for the truth of the matter asserted therein and are not hearsay. Fed. R. Ev. 803(3).

> an employee not to call you, even in an emergency unless he had called the Dispatch Manager first. . . . Another employee tendered his resignation specifically mentioning your unsupportive management style as a reason for wanting to leave.

(*Id.*) In an email addressed to Uritz and Mavrommatis, dated October 17, 2007, Neil Weintraub (a marketing administrator and supervisor in Stamford) told Mavrommatis to "look up 'subordinate' in your little black book . . . . . you are using the wrong term (again) for an employee of this company." Mavrommatis claims Uritz did nothing in response to that "ethnic slur"; however, Mavrommatis does not explain how "black book" is an ethic slur and I have found no evidence to support that the term was used as such.

Uritz completed Mavrommatis's final Performance Evaluation on October 30, 2007. He wrote that Mavrommatis "did not support his subordinates," had an "attitude of doing the bare minimum," and "failed to accept and support the company's cost-saving initiative" in eliminating the Dispatch Manager position. Mavrommatis does not deny that the Performance Evaluation and other documents exist, but argues their content was prepared in conjunction with the legal department to manufacture support for terminating him. He cites as evidence of Carey's plan the Defendants' Privilege Log showing activity between July and September 2007. Carey further claims that Mavrommatis had "poor, unproductive working relationships with each and every Dispatcher that worked for Carey Stamford." Mavrommatis denies the charge, or alleges that any negativity was begun and encouraged by Uritz.

The parties allege many other disputes occurred between Carey and Mavrommatis. For example, the settlement provided that Mavrommatis had a 20% bonus opportunity; sometime afterward it was reduced without explanation to only 10%. Additionally, the parties dispute what

position Mavrommatis actually held at various times, whether Carey intended to give Mavrommatis authority to exercise certain powers, and whether the duties he was asked to perform were commensurate with his position. They dispute how evaluations of Mavrommatis's subordinates were done and whether the process was proper. They dispute the wisdom of Mavrommatis's plan to have dispatchers work weekends. I do not find it necessary to address the conflicts in detail, as explained below.

On November 8, 2007, Uritz provided Mavrommatis with a copy of his final Performance Evaluation and informed him that his employment had been terminated. Mavrommatis received a notice of dismissal and right to sue letter from the EEOC dated June 23, 2008. He filed a complaint in the district court on September 8, 2008.

## II.     Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the

nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

**III. Discussion**

Mavrommatis brings employment discrimination claims against Carey alleging violations of the Age Discrimination in Employment Act ("ADEA"), Title VII, and 42 U.S.C. § 1981. The ADEA and Title VII prohibit discrimination on the basis of race, ethnicity, and national origin. Section 1981 prohibits racial discrimination that inhibits the right "to make and enforce contracts."[6] Retaliatory discharge is actionable under Section 1981 as a result of the Civil Rights Act of 1991, which specifically covers the "termination of contracts."[7]

He also alleges state law claims of breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation regarding the settlement agreement he entered with Carey.

**A.    Retaliation Claims**

Mavrommatis alleges that Carey retaliated against him in violation of 42 U.S.C. § 1981 (Count IV); Title VII, 42 U.S.C. § 2000e-3 (Count V); and ADEA, 29 U.S.C. § 621 et seq. (Count VI).

---

[6] While Section 1981 does not apply to national origin discrimination, it does apply to intentional discrimination based on "ancestry or ethnic characteristics." *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

[7] The Civil Rights Act of 1991 establishes that the phrase "to make and enforce contracts" means "the making, performance, modification, and *termination* of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (emphasis added).

To state a prima facie claim for retaliation under any of the statutory schemes, the plaintiff must show (1) he engaged in protected activity; (2) his employer was aware of the activity; (3) the employer took some adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *see also Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (holding that ADEA retaliation claims are analyzed under Title VII framework); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (holding that section 1981 retaliation claims are analyzed pursuant to Title VII principles). "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.*

There appears to be no dispute regarding the first two elements.[8] Regarding the third element, Mavrommatis has alleged adverse action that falls into three categories. The first, his termination, undoubtably satisfies the element. The second and third categories, Carey's refusal to promote him and various actions or inactions, are disputed. Likewise, the fourth element of the prima facie case, causation, is disputed.

    1.    *Adverse Action*

Title VII's anti-retaliation provision applies broadly to "employer actions that would have been materially adverse to a reasonable employee or job applicant." *Burlington N. & Santa Fe*

---

[8] Mavrommatis filed a formal complaint in February 2006, which Carey was aware of immediately. He filed complaints in December 2006 and February 2007, which Carey was aware of by March 2007 at the latest.

*Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* "Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (alterations, quotations, and citations omitted). Therefore, the antiretaliation provision of Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 164 (quoting *White*, 548 U.S. at 67). The Second Circuit has acknowledged it is an objective standard and requires that "alleged acts of retaliation . . . be considered both separately and in the aggregate." *Id.* at 166.

        a.        Refusal to Promote

Generally, a failure to promote is conduct that would dissuade a reasonable worker from filing or pursuing a retaliation charge. Carey disputes whether any of the particular failures to promote in this case may be considered as adverse actions. Generally, where a plaintiff alleges retaliatory failure to promote, he must allege that he applied and was qualified for the position. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000). Carey argues Mavrommatis admitted he did not apply for any promotions.

That general rule cannot apply, however, if the employer does not invite employees to apply by, for example, posting the opening. *See, e.g.*, *Roberts v. Gadsden Mem. Hosp.*, 835 F.2d 793, 797 (11th Cir. 1988) ("when the failure to promote arises out of an informal, secretive selection process . . . a plaintiff may raise an inference of intentional, racially-disparate treatment without proving that he technically applied for, and failed to obtain, the promotion"). At Carey, open General Manager positions were not generally posted, with the hiring and firing decisions

directly made by Werdebaugh. (Werd. Tr. at 15-16, 61; Mavrommatis Aff. ¶ 13.) Carey's argument is unavailing.

Between 2005 and 2006, Mavrommatis identified two instances when a General Manager position became vacant and was filled by a younger, American-born male, namely, the appointments of Martinez and Uritz. In signing the settlement agreement, however, Mavrommatis waived any claim arising from those actions. They cannot form the basis of his complaint. He alleges only one other GM position that opened after June 2006, in Philadelphia. That failure to promote is discussed in greater detail below.

                b.       Other Purported Adverse Actions

Mavrommatis alleges that a number of other work-related matters constituted adverse actions, including: (1) Carey's reassignment of the Dispatch Manager, Paul Barcellos, to Florida, rather than replacing him; (2) Uritz's decision not to allow Mavrommatis to evaluate certain employees; (3) Uritz's decision not to allow Mavrommatis to implement mandatory weekend shifts for all dispatchers; (4) Carey's actions at the March 2007 lunch meeting where Mavrommatis's possible departure was discussed; (5) Uritz placing negative performance memos in Mavrommatis's personnel file; (6) his assignment to a sub-standard office; and (7) a delay in his receiving a third Carey-provided phone.

The first three actions were not directed at Mavrommatis and his employment terms at all. The last two were directed at Mavrommatis and affected him and his work experience, but the inconvenient office and failure to provide a phone are "petty slights or minor annoyances" that are insufficient to constitute materially adverse employment actions. *See White*, 548 U.S. at 68. Thus, Mavrommatis has not shown that five of the seven actions are actionable adverse

employment actions and none can satisfy the third element of his prima facie case of retaliation.

The lunch meeting discussion of his departure indisputably concerned Mavrommatis's employment terms, but Mavrommatis has not shown the meeting was materially adverse to his bringing a retaliation charge. He has not shown the meeting caused him injury or harm. Mavrommatis was not fired at the meeting; his latest EEOC complaint, his future with the company, and terms of his potential departure were discussed. The meeting itself did not result in a change in the terms of Mavrommatis's employment. Calling a meeting to discuss an employee's future with the company and even his EEOC complaint would not cause an reasonable person to refrain from "making or supporting a charge of discrimination." Neither do adverse records being added to the file rise to the necessary level of causing harm or injury, or dissuading a reasonable person from bringing a charge against the employer.

Carey's actions were not "substantial in gross." Considered in the aggregate, and taking the evidence in the light most favorable to Mavrommatis, Carey's various actions towards Mavrommatis would not support a finding that there was a "campaign of harassment" to retaliate against him for engaging in protected action.

Therefore, the only actionable adverse employment actions are the failure to promote Mavrommatis to a General Manager position in Philadelphia and Mavrommatis's termination.

2.  *Causation*

Mavrommatis has failed to produce evidence from which a reasonable jury could find that the failure to promote him to General Manager in Philadelphia or his termination were caused by retaliatory animus. The failure to promote claim turns on the one GM position that opened after Mavrommatis's first EEOC settlement, in Philadelphia in early 2007. Mavrommatis filed new

EEOC complaints in December 2006 and February 2007.

Mavrommatis has alleged that the settlement reached in June 2006 provided that Carey would consider Mavrommatis for future GM positions. Despite that understanding, Werderbaugh did not ask Mavrommatis to apply nor did he in fact consider Mavrommatis for the Philadelphia position. Werderbaugh alleges that Mavrommatis expressed a desire not to move from New York. Mavrommatis does not dispute that he made that statement, but alleges that he could have continued to live in New York and still filled the Philadelphia position. The close timing of those complaints and the failure to promote raises some inference that the failure to promote was retaliatory.

Regarding Mavromattis's termination, the inference arising from timing is weak. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School Dist. v. Breeden*, 532 U.S. 273 (2001). Carey terminated Mavrommatis's employment more than nine months after the February 2009 filing of his most recent EEOC charge, which is too great a lapse for the timing to create an inference of discrimination. *See, e.g.*, *Cortez v. Conn. Dept of Transp.*, 606 F. Supp. 2d 246, 252 (D. Conn. 2009) (holding six-month lapse too long to provide evidence of a causal connection).

The mere fact that Mavrommatis suffered adverse employment actions does not mean the failure to appoint him or his termination were retaliatory. Mavrommatis must show causation, i.e., that a retaliatory motive played a part in the adverse employment action. He may not rest on his pleadings in the complaint. Mavrommatis has provided no evidence that Werdebaugh, the

individual at Carey responsible for making promotion decisions, harbored any animus towards Mavrommatis based on his protected actions. Neither has he shown any acts or statements by any other manager to support the contention that his termination was motivated by retaliatory animus. Mavrommatis has failed to produce evidence of the fourth element of his prima facie case, causation, and no reasonable jury could find for him. His claims therefore fail.

Even if Mavrommatis did meet each element of his prima facie case, Carey has produced evidence of a legitimate, nonretaliatory reason for terminating Mavrommatis. Carey has shown through a variety of sources, including Mavrommatis himself, that he had poor working relationships with coworkers in Stamford, and that toward the end of his employment he was given ninety days to improve his performance but failed to do so. Although he received a positive evaluation in October 2006 when he was still working partially in Westchester, no positive evaluations were made after his arrival in Stamford full-time. Mavrommatis has not produced any evidence suggesting that Carey's legitimate, nonretaliatory reason for terminating Mavrommatis after eleven months in Stamford was pretextual. Accordingly, his retaliation claims fail on all grounds.

B. Discrimination Claims

Mavrommatis alleges that Carey discriminated against him on the basis of age in violation of the ADEA, 29 U.S.C. § 621 et seq. (Count I); on the basis of his race and/or national origin in violation of Title VII, 42 U.S.C. § 2000e (Count II); and on the basis of race, ethnicity and/or ancestry in violation of 42 U.S.C. § 1981 (Count III).

To survive summary judgment in a Title VII (or ADEA) case, a plaintiff must first establish a prima facie case by demonstrating that: (1) he is a member of a protected class; (2) his

job performance was satisfactory; (3) he suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination.

To survive summary judgment in a Section 1981 case, a plaintiff much establish: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.). *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993).

Generally, a plaintiff's claim is analyzed under the *McDonnell Douglas* burden-shifting test. *See Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). "The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as 'minimal' and 'deminimus.'" *Jute v. Hamilton Sunstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (citations omitted). "If the plaintiff demonstrates a prima facie case, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action." *Demoret*, 451 F.3d at 151. "If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Id.* at 151.

Regarding the first element, Mavrommatis can show he is a member of a protected class in terms of (1) age because he was at least 46, that is, over 40 as required by the ADEA; (2) national origin because he is from Cyprus, satisfying Title VII; and (3) has different ancestry or ethnic characteristics including an accent, satisfying Section 1981. Regarding the third element, the analysis of actionable adverse employment actions is no broader than the analysis above for

retaliation; termination and failure to promote are actionable events.[9]

Carey vigorously disputes the second element, that Mavrommatis's job performance was satisfactory, by pointing to its proffered legitimate, non-discriminatory reasons for terminating him. Mavrommatis had all positive performance evaluations until the PIP, which was produced approximately three months before he was terminated in November 2007. I assume without deciding that Mavrommatis meets the second element.

Regarding the fourth and final element, Mavrommatis again fails to produce any evidence to support a claim that "the action occurred under conditions giving rise to an inference of discrimination." In the limited time period between his settlement agreement in June 2006 and his termination in November 2007, Mavrommatis can point to no statements or actions by any decision-maker at Carey that show animus for someone of his age, national origin, or ethnic characteristics, or any evidence suggesting his protected characteristics motivated Carey's decision not to promote and then to terminate Mavrommatis. Accordingly, his discrimination claims under the ADEA, Title VII, and Section 1981 all fail.

C.  State Law Claims

Mavrommatis's state law claims include breach of contract (Count VII), breach of the covenant of good faith and fair dealing (Count VIII), and negligent misrepresentation (Count IX). The various disputes described by the parties – the change in Mavrommatis's bonus opportunity

---

[9] Remarking on the Supreme Court's decision in *White*, the Second Circuit has noted "it is now clear that Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader" under the statute. *Hicks*, 593 F.3d at 165. Accordingly, even taking the evidence in the light most favorable to Mavrommatis, no actions that fail to violate Title VII's retaliation provisions can be found to violate Title VII's discrimination provisions.

following the settlement; personnel management issues; and whether Mavrommatis was given powers commensurate with his titles – do not bear on my analysis of retaliation or discrimination but may be material to Mavrommatis's breach and other state law claims.

This opinion dismisses all of Mavrommatis's federal claims, however, and I decline to exercise supplemental jurisdiction over his pendent state law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966) (holding that, where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution by the state courts); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases).

## IV. Motion to Strike

I reached the decision to grant summary judgment viewing only uncontroverted evidence, including primarily Mavrommatis's admissions and testimony, and without relying on the challenged portions of affidavits submitted by Carey, including Uritz's affidavit. Accordingly, the motion to strike those affidavits is denied as moot.

## V. Conclusion

Mavrommatis has failed to make out a prima facie case of either retaliation or discrimination. He produced no evidence to support the claim that his employer was motivated by illegal animus when it failed to promote him and when it terminated him. Even if he had proven a prima facie case, Carey has shown legitimate, nonretaliatory and non-discriminatory reasons for terminating him, and Mavrommatis failed to produce evidence that the reasons were a pretext for discrimination or retaliation. Accordingly, the motion for summary judgment (**doc. # 46**) is **GRANTED**. Mavrommatis's motion to strike (**doc. # 79**) is **DENIED AS MOOT**.

It is so ordered.

Dated at Bridgeport, Connecticut, this 23rd day of July 2010.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge